Filed 4/27/22  P. v. Marquez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060954 |
| v. | (Super. Ct. No. F28556) |
| MARK ANTHONY MARQUEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Santa Cruz County, Stephen S. Siegel, Judge.  Affirmed.

Joseph Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Catherine A. Rivlin and Bruce M. Slavin, Deputy Attorneys General, for Plaintiff and Respondent.

Mark Anthony Marquez appeals from the judgment after a jury convicted him of forcible rape (Pen. Code, § 261, subd. (a)(2))[1] and rape of an intoxicated person (§ 261, subd. (a)(3)). Marquez raises two issues on appeal. First, he contends his forcible rape conviction should be reversed because it resulted from vindictive prosecution, a violation of his state and federal constitutional rights to due process. Because his trial counsel did not raise this issue below, thereby forfeiting his appellate claim, Marquez alternatively argues his counsel's omission constitutes ineffective assistance. We conclude the prosecution's reinstatement of the forcible rape charge, which it had dismissed earlier in the proceedings, did not raise a presumption of vindictive prosecution, and therefore, we reject Marquez's claim in either configuration. Second, Marquez asserts the trial court prejudicially erred by permitting the prosecution to rebut the defense character evidence with testimony concerning specific acts of domestic violence he perpetrated on an ex-girlfriend. We agree the court erred but conclude the error was harmless. Accordingly, we affirm.

FACTS

I. *Procedural Facts*

In the initial information, the prosecution charged Marquez with rape of an unconscious person (§ 261, subd. (a)(4); count 1) and forcible rape (§ 261, subd. (a)(2); count 2). Prior to trial, the prosecution amended the information by substituting a charge of rape of an intoxicated person (§ 261, subd. (a)(3)) for the forcible rape charge. The prosecution did not give a reason for the substitution, and the defense did not object.

Marquez proceeded to trial on the two charges. The jury was unable to reach a unanimous verdict, and the court declared a mistrial.

Prior to the retrial, the prosecution made a plea offer to Marquez, which he rejected. The prosecution then filed a second amended information, restoring the forcible

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

rape charge; this time as count 3. The prosecutor explained she was reinstating the charge based on conversations she had with the first jury. The defense objected. The trial court inquired whether the "change in the charging" would "affect the defense preparation for trial or strategy?" When defense counsel responded it would not, the court permitted the prosecution to file the amended information.

Following the retrial, the jury convicted Marquez of rape of an intoxicated person (count 2) and forcible rape (count 3). The jury was unable to reach a verdict on rape of an unconscious person (count 1), and the court later dismissed it. The court imposed the midterm of six years on both rape convictions but stayed the term for forcible rape under section 654.

II. *Substantive Facts*

A. *Prosecution's Case-in-Chief*

1. *Marquez and L.B. Reunite at a Bar*

Marquez had known L.B., the victim, since they were teenagers. They met through L.B.'s boyfriend, who became her husband. The two families frequently socialized together. Marquez and his family moved to Oregon in 2005, and L.B. lost touch with them. L.B. and her husband divorced.

On August 9, 2013, L.B.'s softball team had a scrimmage game. At the game, L.B. had two "tall boy" beers. After the game, she stopped at the house of her friend Daniel C. (Daniel) and smoked marijuana, before going to a bar with her friend Amy C. (Amy) and other teammates. While at the bar, L.B. had two double vodka drinks.

L.B. saw Marquez at the bar and sat down next to him. She introduced him to Amy. After talking for a while, L.B. asked Marquez where he was staying. She told him he could spend the night at her apartment and sleep on the couch or in her daughter's bedroom because her daughter was out of town. The invitation was not for sex.

When the bar closed around 11:00 p.m., Marquez went with L.B., Amy, and others to a nearby bar. On the way, L.B. smoked marijuana. She was feeling good or "buzzed" but was not drunk. At this bar, L.B. got another vodka drink but not a double. She took a few sips of her drink before heading to the dance floor by herself. After a couple of songs, she returned to the table and her drink. About halfway through her drink, she started feeling "really weird." As she was walking to the bathroom, her legs gave out from underneath her. She felt hot, sweaty, and sick. L.B. told Amy she did not feel well, and Amy helped her to the bathroom.

After vomiting in the bathroom, L.B. still felt sick and unstable, so she did a line of cocaine to sober up. She went outside with Amy to get some fresh air, where she threw up again. L.B. asked Amy to call her a cab because she wanted to go home. When the cab arrived, either L.B. or Amy asked Marquez if he was leaving with L.B. Marquez got into the cab with her.

Once they got to L.B.'s apartment, she went to the bathroom and vomited again. She was still dizzy and did not feel well. L.B. retrieved some cocaine from her nightstand, and her and Marquez each did a line of cocaine. They talked for a few minutes, but there was no flirting, kissing, or sexually charged interactions. L.B. gave Marquez a blanket and a pillow and told him he could sleep on the couch or in her daughter's bedroom. She did not invite him to come into or sleep in her bedroom.

Before going to bed, L.B. took the bathroom trash can and put it next to her bed. She locked her bedroom door, stripped down, turned off the light, and got into bed. She still did not feel well. She passed out but would intermittently wake up to vomit before passing out again. She was sleeping facedown on the left side of her bed and was covered by a sheet or blanket.

2. *Marquez Rapes L.B.*

L.B. was awakened by the sound of a "loud pop" at her bedroom door. She looked up and saw her bedroom door was open and Marquez was standing in the

4

doorway. She asked what he was doing. He asked to come in and lie down with her. She told him to leave, but he did not. Instead, he got on the bed. The movement of the mattress made L.B. vomit again. She told him to get out, but again, he did not.

Marquez grabbed L.B.'s left arm, pulled it behind her, and put her left hand on his exposed, erect penis. She yanked her hand away and said, "Ewhh. Gross. No." L.B. tried to roll away from Marquez. She was angry and told him to leave or she was going to punch him. He chuckled and said, "No, you're not." Marquez positioned himself on L.B.'s back. She could not breathe because of his weight on top of her. Unable to stay awake, she passed out. She woke up and felt Marquez's penis penetrating her vagina before she passed out again.

3. *After the Rape*

When L.B. woke up around 4:20 a.m., Marquez was gone. She sat up and felt semen coming out of her vagina. She got up, put on clothes, and went to the bathroom. She slept on the couch because she did not want to return to the bed. When L.B. got up later that morning, she felt ashamed and embarrassed. She attended a wedding that afternoon but did not tell anyone Marquez had raped her.

Throughout the day, Marquez repeatedly called L.B. and sent her text messages. His first call was at 4:48 in the morning. She did not answer his calls and only responded to one text message, telling him she was at a wedding. He called her a couple of times the following day as well.

After the wedding, L.B. stayed home on her couch for a few days because she was ashamed and depressed. One of her close friends, Tanya W. (Tanya), came over because L.B. was not responding to her calls or text messages. L.B. was pale and appeared very nervous. Tanya and L.B. went to their favorite spot. While they were there, L.B. told Tanya Marquez had raped her. L.B. was upset and crying.

The next day, L.B. went to Daniel's home and told him Marquez had raped her. L.B. called the police after Daniel advised her to do so.

5

4. *Police Investigation*

Officer Ian Burnham interviewed L.B. at Daniel's house. She then underwent a sexual assault response team (SART) examination at the hospital. The nurse who performed the exam did not observe any injuries, but she did not expect to find any because it had been several days since the incident and vaginal tissue heals quickly.

Burnham met L.B. at her apartment after she returned from the hospital. He photographed the scene and collected her bedsheets for DNA testing.

Several months later, L.B. was at a bar when Marquez walked up to her and said, "Hey, long time no see." She instantly felt sick to her stomach. She was shocked to see him because she thought he lived in Oregon. L.B. walked away and went to the bartender, whom she knew. The bartender thought L.B. was having a panic attack because she was "ghostly white" and she had never seen L.B. like that. L.B. told her what Marquez had done to her, that he was in the bar, and she was scared. The bartender got L.B. a phone, and L.B. called the police.

Sergeant Mark Eveleth and Officer Mark Bailey arrived and talked to L.B., who was visibly upset and shaking. Officer Brian Warren found Marquez in the bar. Marquez agreed to go outside to talk to Warren and then agreed to go to the police station for an interview. In the interview, Marquez said he was drinking with friends at a bar in August when he saw L.B., whom he had known for a long time but had not seen since he moved to Oregon. When asked to provide his version of what happened that night, Marquez said he was "a little intoxicated" at the time of the interview and he needed a minute to remember that night. He told the officers L.B. and others were doing cocaine at the bar, but he did not partake. He said L.B. started vomiting after they went to the second bar because she was very intoxicated. When L.B. came out of the bathroom, she asked him to help her home. She called for a cab and asked him to come with her to make sure she got home okay. He agreed and got into the cab.

6

When they arrived at L.B.'s apartment, they went inside and were talking. L.B. brought out cocaine and started doing lines on the table. Marquez told her to sleep it off and she would feel better in the morning. After doing more lines, L.B. went into her bedroom and said she was locking the door. Marquez gave L.B. his phone number and told her to call him if she had any problems. He then called a friend to come pick him up. He called L.B. the next day to check on her. She did not respond initially but later sent him a text message saying she was feeling better and was at a wedding.

Marquez denied going into L.B.'s bedroom or getting into bed with her. He denied taking his clothes off, masturbating, or having sex with L.B. in the apartment. Marquez willingly provided a DNA sample, and the officers drove him back to the bar.

In 2014, forensic analysis was performed on the evidence collected during L.B.'s SART exam. No semen was detected on the cervical swab taken from L.B. In 2015, L.B.'s bedsheet was analyzed and semen matching Marquez's DNA profile was found on the sheet.

In August 2015, Marquez was arrested at his residence in Oregon and extradited to Santa Cruz, where Detective Bruce Cline and Warren interviewed him at the jail. Marquez was informed his DNA was found on L.B.'s bedsheets and asked if he had an explanation. Marquez responded, "Not at this time." He denied raping L.B. or having any sexual contact with her. Marquez said he was only at L.B.'s apartment for about 10 minutes and was wearing a knee brace at the time because he had had knee surgery.

The police obtained Marquez's phone records for the days surrounding the rape. There were no calls from L.B. to Marquez from August 8 through 11. However, there were eight or nine calls from Marquez to L.B. the day after the rape.

B. *Defense Case*

1. *Marquez's Testimony*

Marquez testified he had known L.B. for a long time but did not see her for several years after he moved to Oregon. L.B. came up to him when he was with his

7

friend at a bar, and they talked for a while. Later, Marquez and his friend went to another bar next door. L.B. and her friends also moved to the bar next door. Marquez did not talk to L.B. much while they were there. He did not realize she was feeling unwell until she came back to the table and told him. She asked him to help her get home. He thought her request was "kind of weird" but agreed to go.

When they got to her apartment, L.B. invited him in and he sat down on the couch. She offered him cocaine, and they both had some. L.B. did not appear sick and was not vomiting. Marquez went to the bathroom. When he returned, L.B. was in her bedroom. She told him he could sleep on the couch or in her bedroom. He went into L.B.'s bedroom and saw her lying naked on the bed. Marquez walked over to the bed and sat down on its side. His leg brace prevented him from bending his leg. He intended to tell her he was not going to spend the night. She started rubbing his leg, then his groin, and undid his pants. She massaged his penis until he ejaculated. Marquez felt terrible and weird. He told her he was going to leave and would call her the next day. The next day, Marquez called L.B. several times and sent her text messages because he felt "weird" about what happened and was afraid she would tell his wife.

Marquez saw L.B. at a bar several months later. When he said hello to her, she looked at him "weird" and disappeared. Marquez was drinking with his friends when the police arrived. He went outside, talked to the police, and agreed to go to the police station. They told him that L.B. accused him of raping her, which he denied. Marquez admitted he lied to the police about what transpired in L.B.'s apartment but said he did so to protect his family.

2. *Defense Character and Supporting Witnesses*

Marquez presented eight character witnesses, all of whom had known him for years and said he did not have a reputation for being sexually aggressive or sexually

8

inappropriate. The defense character witnesses also said Marquez had a reputation for honesty, and in their opinions, he was honest.

Marquez's wife testified he wore a leg brace around the time of the incident, which prevented them from having sex in certain positions. Another defense witness testified L.B. had a reputation for going out to bars, partying a lot, and doing cocaine.

C. *Prosecution's Rebuttal Evidence*

1. *Marquez's Ex-girlfriend*

Around 1993, Jennifer J. (Jennifer) dated Marquez for six months; they both were 20 years old at the time. In her testimony, she described multiple incidents in which Marquez was physically violent with her.

The first incident occurred when Jennifer wanted to stay the night at her girlfriend's house. Marquez became jealous because he thought Jennifer and her friend were going to meet other guys. He choked her and he used a lighter to burn her. On another occasion, he choked her and punched her in the face, bruising her face.

They broke up because she believed he was cheating on her, but they remained in contact for a couple of weeks after the breakup. When they discussed getting back together, Jennifer told Marquez she was seeing someone else. Marquez became very angry; he yelled and called her names. Marquez demanded to know where the other guy lived so he could confront him. When Jennifer did not tell him, Marquez tried to force her into his car by choking her, pulling her hair, and shoving her into the car. Despite Jennifer's resistance and protestations, Marquez succeeded in forcing her into the car. While Marquez was driving, Jennifer twice tried to get out of the car when he paused at stop signs. Both times, Marquez struck her left eye with the back of his hand. He threatened to kill her and leave her on the side of the road. When they arrived at the home of someone she knew, she ran inside. After talking to her mother and a friend,

9

Jennifer called the police. Jennifer and Marquez reconnected in 2015, and he apologized for the incidents.

In Jennifer's opinion, Marquez was not an honest person. She did not have an opinion as to whether or not he was sexually aggressive toward women; he was never sexually aggressive toward her. At no time had she heard he had a reputation for being sexually inappropriate or sexually aggressive with women. In her opinion, he was physically aggressive toward women. But other than her personal experience, she did not know of him being physically aggressive with women.

2. *Other Rebuttal Evidence*

A defense investigator spoke with Marquez's wife by telephone prior to the retrial. During the interview, Marquez's wife stated she did not trust Marquez and he had lied to her about a lot of things. She called him a liar and said she was tired of supporting him. Marquez's wife contacted the investigator again later. She explained she was drunk when she accused Marquez of being a liar, and when she said he was not being truthful, she was referring to financial issues in their divorce. The investigator also spoke to one of Marquez's character witnesses, who stated she ended her relationship with him because of rumors he may have stolen things from work and she believed he was cheating or about to cheat on her.

D. *Defense Surrebuttal Evidence*

Marquez retook the stand in response to Jennifer's testimony. He admitted being physically abusive to her during their relationship and pleading guilty to a misdemeanor domestic violence charge. He felt terrible about what happened and when he talked to her a few years after their relationship ended, he apologized to her.

DISCUSSION

I. *Vindictive Prosecution*

Marquez asserts a presumption of prosecutorial vindictiveness was created because "the prosecution increased the charges against him" by reinstating the forcible

10

rape charge after his first trial ended in a hung jury and he rejected the prosecution's plea offer prior to the second trial. We disagree.

A. *Applicable Law*

"Section 1009 governs the amendment of accusatory pleadings. It provides, in relevant part, that '[t]he court in which an action is pending may . . . permit an amendment of an . . . information . . . for any defect or insufficiency, at any stage of the proceedings . . . .' [Citation.] Generally speaking, courts have construed section 1009 as allowing the addition of new charges after a mistrial. [Citation.]" (*People v. Sanchez* (2020) 49 Cal.App.5th 961, 982 (*Sanchez*).)

However, the due process clauses of the federal and state Constitutions prohibit the prosecution from increasing the charges against a defendant in retaliation for the defendant's exercise of a constitutional right. (*People v. Jurado* (2006) 38 Cal.4th 72, 98.) When a prosecutor does this, it is called prosecutorial vindictiveness. (*United States v. Goodwin* (1982) 457 U.S. 368, 372-374.) "The constitutional protection against prosecutorial vindictiveness is based on the fundamental notion that it 'would be patently unconstitutional' to 'chill the assertion of constitutional rights by penalizing those who choose to exercise them.' [Citation.]" (*In re Bower* (1985) 38 Cal.3d 865, 873 (*Bower*).)

The state and federal due process clauses protect a defendant not only against actual prosecutorial vindictiveness but also from the appearance of vindictiveness. (*North Carolina v. Pearce* (1969) 395 U.S. 711, 725; *Bower, supra*, 38 Cal.3d at p. 876; *Twiggs v. Superior Court* (1983) 34 Cal.3d 360, 371 (*Twiggs*).) "'A vindictive prosecution claim may be established "'by producing direct evidence of the prosecutor's punitive motivation.'"' [Citations.] In the absence of such direct evidence, a defendant may raise a presumption of vindictiveness by making a prima facie showing that the prosecutor's actions raise a 'reasonable likelihood of vindictiveness.' [Citations.]" (*Sanchez, supra*, 49 Cal.App.5th at pp. 982-983.)

11

A presumption of unconstitutional vindictiveness is raised if the prosecutor increases the charges thereby subjecting the defendant to a potentially more severe sentence after a successful appeal (*People v. Ledesma* (2006) 39 Cal.4th 641, 731 (*Ledesma*)) or a mistrial (*Bower, supra*, 38 Cal.3d at p. 873; *Twiggs, supra*, 34 Cal.3d at pp. 368-370). This presumption "is a legal presumption." (*Bower, supra*, 38 Cal.3d at p. 879.) It "is not based on the subjective state of mind of the individual prosecutor and does not imply that he or she individually harbors an improper motive." (*Ibid.*)

"Where the defendant shows that the prosecution has increased the charges in apparent response to the defendant's exercise of a procedural right, the defendant has made an initial showing of an appearance of vindictiveness. [Citation.]" (*Twiggs, supra*, 34 Cal.3d at p. 371.) "The defendant need not demonstrate that the prosecution in fact acted with a retaliatory motive. [Citation.] Once this prima facie case is made, the prosecution bears a 'heavy burden' of dispelling the appearance of vindictiveness as well as actual vindictiveness. [Citations.]" (*Ibid.*) "In order to rebut the presumption of vindictiveness, the prosecution must demonstrate that (1) the increase in charge was justified by some objective change in circumstances or in the state of the evidence which legitimately influenced the charging process and (2) that the new information could not reasonably have been discovered at the time the prosecution exercised its discretion to bring the original charge." (*Bower, supra*, 38 Cal.3d at p. 879.)

Our Supreme Court has not determined the standard of review for a claim of vindictive prosecution. (See *People v. Ayala* (2000) 23 Cal.4th 225, 299 [rejecting defendant's claim of vindictive prosecution "under any standard of review"].) When considering vindictive prosecution claims, Courts of Appeal review the trial court's factual findings for substantial evidence and review de novo the trial court's legal determination. (*Sanchez, supra*, 49 Cal.App.5th at p. 983.)

B. *Forfeiture*

Preliminarily, we must determine whether Marquez's claim of vindictive prosecution was preserved for appeal because the failure to raise the issue in the trial court forfeits it on appeal. (*Ledesma, supra*, 39 Cal.4th at p. 730.) When the prosecutor sought to reinstate the forcible rape charge prior to the second trial, defense counsel made only a general objection to the amendment of the information. Marquez asserts his counsel's objection was nevertheless sufficient to preserve the issue for appeal given the context in which it was made. The Attorney General contends otherwise, asserting the "generic objection did not apprise the trial court that [Marquez] was raising a claim of vindictive prosecution." We agree with the Attorney General.

Defense counsel's objection, even in the context in which it occurred, failed to alert the court a claim of vindictive prosecution was being asserted. Because the defense objection was general in nature, the trial court did not determine whether Marquez had made an initial showing of an appearance of vindictiveness, the prosecution was deprived of an opportunity to rebut any such presumption, and the trial court never ruled on whether the prosecution had violated Marquez's due process rights. Therefore, Marquez's claim of vindictive prosecution is forfeited on appeal. (*Ledesma, supra*, 39 Cal.4th at p. 730.)

Marquez anticipates forfeiture may apply. He asserts if his counsel's objection was insufficient to preserve the issue for appeal then he was deprived of his constitutional right to the effective assistance of counsel. Thus, we proceed to the merits of his vindictive prosecution claim. (See *People v. Williams* (1998) 61 Cal.App.4th 649, 657 [addressing merits despite forfeiture because defendant alternatively argued ineffective assistance of counsel].) As we explain below, reinstatement of the forcible rape charge did not raise a presumption of prosecutorial vindictiveness because it did not subject Marquez to a potentially more severe sentence than he originally faced.

13

C. *Analysis*

Marquez contends reinstatement of the forcible rape charge "raised the stakes of going to trial" for two reasons. The forcible rape charge, unlike the other rape charges, (1) increased his potential minimum sentence because it would render him ineligible for probation, and (2) increased his potential time in custody because it was a violent felony and his custody credits would be limited under section 2933.1.[2] This contention misses the mark. Because Marquez was originally charged with forcible rape, the reinstatement of this charge did not increase his exposure beyond that in the original charging document.

It is for this reason we find Marquez misplaces his reliance on *Twiggs, supra*, 34 Cal.3d 360. In *Twiggs*, defendant's first trial resulted in a mistrial. (*Id.* at p. 364.) After defendant declined the prosecution's plea bargain offer and invoked his right to a retrial, the prosecution moved a few days later to amend the information to include five prior felony convictions as sentence enhancements. (*Ibid.*) The prosecution knew of defendant's prior convictions before the first trial but failed to allege them until after the mistrial and the rejected plea offer. (*Id.* at pp. 364-365, 368.) Our Supreme Court concluded these circumstances gave rise to a presumption of vindictiveness. (*Id.* at pp. 372, 374.)

Here, however, the prosecution originally charged Marquez with forcible rape. Although the prosecution discarded this theory of rape prior to the first trial, reinstating it prior to the second trial did not expose Marquez to a potential sentence more severe than he faced from the original charges. Thus, the circumstances do not give rise to a presumption of vindictiveness.

---

[2]     The rape occurred in 2013, prior to the 2016 amendment of section 1203.065, which also excluded from probation eligibility defendants convicted of rape of an intoxicated person (§ 261, subd. (a)(3)) and rape of an unconscious person (*id.*, subd. (a)(4)). (Stats. 2016, ch. 863, § 1.)

14

We also find distinguishable the situation in *Bower, supra*, 38 Cal.3d 865, another case Marquez relies upon. In *Bower*, defendant and a codefendant were charged with murder. (*Id.* at p. 870.) Defendant was also charged with being an accessory, and his codefendant was charged with personal use of a firearm; thus, the charges reflected the prosecution's theory the codefendant fired the single shot that killed the victim. (*Ibid.*) Defendant's trial was severed, and his codefendant was tried first. The jury convicted the codefendant of second degree murder and found he personally used a gun in the commission of the murder. (*Ibid.*) At defendant's trial, the prosecution agreed to a stipulation that limited his liability to second degree murder. (*Ibid.*) However, a mistrial was declared after the prosecution's last witness revealed inadmissible evidence. (*Ibid.*) At the retrial, the prosecutor refused to renew the stipulation. (*Id.* at p. 871.) The prosecutor called the same witnesses it had called in the first trial and offered no new facts in the retrial. (*Id.* at pp. 871, 877.) The jury convicted defendant of first degree murder. (*Id.* at p. 871.)

Defendant in *Bower* filed a habeas corpus petition, arguing his right to due process was violated when the prosecution increased the severity of the charge against him after jeopardy had attached and he had exercised his right to a fair trial by successfully moving for a mistrial based on prosecutorial error. (*Bower, supra*, 38 Cal.3d at p. 869.) In an affidavit filed in response to the habeas corpus petition, the prosecutor stated he had withdrawn the stipulation because in the week between the trials he had reevaluated the evidence and concluded defendant had fired the fatal shot and not his codefendant, as previously believed. (*Id.* at p. 871.) The Supreme Court concluded the circumstances presented "a reasonable likelihood of vindictiveness." (*Id.* at p. 877.) The *Bower* court explained, "Because of the time and effort invested in the first proceeding . . . the prosecution had 'a great interest in discouraging defendant's assertion of a retrial.' [Citation.]" (*Ibid.*) The court found the presumption of vindictive prosecution applied when the prosecution increased the severity of the potential charges

15

after defendant was granted a mistrial. (*Ibid.*) The Supreme Court further concluded the prosecution had "not met [its] heavy burden of demonstrating that the withdrawal of the stipulation resulted from the discovery of facts, not available at the time of the stipulation, which would legitimately have influenced the charging process." (*Id.* at p. 873.) Thus, the constitutional prohibition against vindictive prosecution barred the prosecution from increasing the charge to first degree murder after defendant exercised his right to a fair trial. (*Id.* at p. 880.)

In *Bower*, the prosecution's original theory was defendant aided and abetted the murderer and his liability was limited to second degree murder. (*Bower, supra*, 38 Cal.3d at p. 870.) In the retrial, the prosecution deviated from that theory and obtained a first-degree murder conviction. (*Id.* at p. 871.) The procedural stance of this case differs from *Bower*. In the retrial, here, the prosecution pursued the same forcible rape theory it had when it originally charged Marquez. The reinstatement of the forcible rape charge did not increase Marquez's potential exposure to punishment beyond that he originally faced. Thus, the reinstatement of the forcible rape charge did not raise the presumption of vindictive prosecution.

As Marquez's prosecutorial vindictiveness claim is without merit, any objection to the reinstatement of the forcible rape charge on this ground would have also lacked merit. Therefore, defense counsel's failure to make such an objection did not constitute ineffective assistance. (*People v. Anderson* (2001) 25 Cal.4th 543, 587 [counsel not required to make futile objections].)

II. *Evidence Code Section 1102*

After the defense presented witnesses to testify to Marquez's good character and reputation, the prosecution rebutted this evidence with Jennifer's testimony, in which she described specific acts of domestic violence Marquez committed during their relationship. Marquez contends the trial court abused its discretion by admitting this rebuttal evidence because it was prohibited under Evidence Code section 1102. He

16

further asserts the error was prejudicial and requires the reversal of his convictions. While we agree the admission of this evidence was erroneous, we conclude the error was harmless.

A. *Background*

In 1994, Marquez pleaded guilty to misdemeanor false imprisonment (§ 236) and battery (§ 242). As part of his plea deal, a felony kidnapping charge (§ 207) was dismissed. These charges were based on his abuse of Jennifer during their six-month relationship.

Prior to the trial on the rape charges, the prosecution requested the court rule these prior convictions, as well as Marquez's other prior convictions, and their underlying conduct be admissible for impeachment. Marquez objected to the admission of this evidence. The trial court ruled Marquez's prior convictions, all of which were at least 25 years old, were inadmissible for impeachment but might be admissible to rebut a defense witness's opinion testimony about a character trait. The court indicated Marquez's battery conviction would be admissible if the defense opened the door by presenting evidence he did not have a violent history.

At trial, Marquez presented eight character witnesses who testified to their opinions that he was not sexually aggressive or inappropriate and had a reputation in the community for the same and being honest. The prosecutor cross-examined the character witnesses as to whether they were aware Marquez previously had been convicted of false imprisonment and battery against an ex-girlfriend.

After the defense rested, the prosecutor sought to call Jennifer as a rebuttal witness. Prior to her taking the stand, defense counsel objected "to any testimony based on physical violence." Counsel informed the court the prosecutor wanted to use Marquez's misdemeanor domestic violence convictions and get into the issue of his physical violence. Counsel asserted he did not ask the defense witnesses about physical violence, only sexual violence or inappropriateness. He argued Jennifer's testimony was

17

inadmissible because it did not rebut the defense character evidence. Counsel reminded the court Jennifer testified in the first trial Marquez was not sexually violent or sexually inappropriate with her.

The prosecutor asserted evidence Marquez was "domestically violent" with Jennifer was relevant to rebut the defense character witnesses because the defense had asked them if Marquez was aggressive toward women. The court found the defense had opened the door by asking the character witnesses about sexually aggression and permitted the prosecution to present Jennifer's testimony.

In her testimony, Jennifer described one incident in which Marquez choked her and burned her with a lighter; a second incident when he choked her and punched her; and a third incident, in which he choked her, pulled her hair, forced her into a car, and backhanded her in the face two times. She also testified Marquez in her opinion was not an honest person and was physically aggressive toward women.

B. *Applicable Law*

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion. [Citations.]" (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) Evidence Code "[s]ection 1102 creates an exception to this rule in criminal cases . . . ." (*People v. Felix* (1999) 70 Cal.App.4th 426, 430 (*Felix*).) It permits "evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation" when it is: "(a) [o]ffered by the defendant to prove his conduct in conformity with such character or trait of character" or "(b) [o]ffered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (Evid. Code, § 1102.)

Under Evidence Code section 1102, the defense may present evidence of the defendant's character or character trait through opinion or reputation testimony. (*Id.*, subd. (a).) Once the defense does so, the prosecution may rebut this testimony, but

18

only with evidence in the same form—opinion or reputation evidence. (*Id.*, subd. (b).) The prosecution may not use evidence of specific instances of conduct to rebut defense character evidence (*People v. Wagner* (1975) 13 Cal.3d 612, 619 (*Wagner*)), which means the prosecution may not use evidence of a prior conviction to rebut defense character evidence. (*Felix, supra*, 70 Cal.App.4th at p. 431.)

C. *Analysis*

Marquez contends the trial court erred by permitting Jennifer to testify about specific acts of domestic violence he committed because such evidence was inadmissible under Evidence Code section 1102. Reviewing the trial court's evidentiary ruling for an abuse of discretion (*People v. Doolin* (2009) 45 Cal.4th 390, 437), we agree.

After the defense presented opinion and reputation testimony concerning Marquez's character traits, the prosecution could properly rebut this evidence with Jennifer's opinion testimony regarding those character traits. (Evid. Code, § 1102, subd. (b).) However, most of Jennifer's testimony concerned specific acts Marquez perpetrated on her, and this evidence was inadmissible. (See *Felix, supra*, 70 Cal.App.4th at p. 431.)

In arguing otherwise, the Attorney General seems to misunderstand the issue. The Attorney General contends the defense "opened the door to the prosecution's rebuttal evidence" by presenting defense opinion testimony concerning Marquez's good character with women. The issue, however, is not whether the prosecution should have been permitted to rebut the defense evidence; the issue is the *form* of the prosecution's rebuttal evidence that was admitted. Under Evidence Code section 1102, evidence of specific instances of conduct, including Jennifer's testimony regarding the facts underlying Marquez's prior criminal convictions, was inadmissible. (*Felix, supra*, 70 Cal.App.4th at pp. 431-432.)

Similarly, the Attorney General misplaces his reliance on *People v. Simon* (2016) 1 Cal.5th 98, 145 (*Simon*) to support his argument the trial court properly admitted

Jennifer's rebuttal testimony. *Simon* does not address the admissibility of evidence under Evidence Code section 1102. Instead, it addresses the admissibility of rebuttal evidence in the penalty phase of a death penalty trial. In that context, when the defendant claims his character weighs in favor of mercy, the prosecution is permitted to rebut the claim with evidence "offering a different account of the defendant's character." (*Simon, supra*, 1 Cal.5th at p. 144.) The prosecution may introduce bad-acts evidence in certain circumstances in the penalty phase to rebut the defense character evidence. (*Id.* at p. 145.) That situation is far from the one before us.

D. *Harmless Error*

Having found the court erred by admitting Jennifer's testimony concerning specific acts of domestic violence by Marquez, we turn to the issue of whether the error was prejudicial. Marquez contends the admission of Jennifer's testimony violated his federal constitutional right to due process and therefore we should apply the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24. We disagree.

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional" test under *People v. Watson* (1956) 46 Cal.2d 818, 836, in which the reviewing court determines whether "it is reasonably probable the verdict would have been more favorable to the defendant absent the error. [Citations.]" (*People v. Partida* (2005) 37 Cal.4th 428, 439.) We are not persuaded by Marquez's contention the admission of Jennifer's testimony rendered his trial fundamentally unfair. Thus, we apply the *Watson* test. (*Felix, supra*, 70 Cal.App.4th at pp. 432-433 [error reviewed under *Watson* standard].) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and

20

the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

Here, there is no reasonable probability Marquez would have enjoyed a more favorable result had the trial court excluded Jennifer's testimony concerning his prior acts of domestic violence. As Marquez aptly notes, the trial pitted L.B.'s credibility against his. At trial, Marquez's credibility crumbled as he was confronted with his prior statements to the police, in which he denied any sexual contact with L.B., and he admitted lying to the police about what transpired inside L.B.'s apartment. His version of consensual sexual activity was undermined by his failure to offer this story before when the police asked him to explain why his DNA was on L.B.'s sheets.

The testimony of the defense character witnesses could not undo the damage done to Marquez's credibility. Although the defense character witnesses testified to their good opinion of Marquez's character traits, the prosecution properly cross-examined them as to whether they were aware of his prior convictions for battery and false imprisonment of an ex-girlfriend. (See *Wagner, supra*, 13 Cal.3d at p. 619 [when a defense witness has provided reputation testimony, the prosecution may inquire whether the witness has heard of acts or conduct inconsistent with witness's testimony].) One witness testified that if Marquez had been convicted of such crimes, it would change her opinion Marquez was not aggressive toward women. Through the prosecutor's cross-examination, the jury learned of Marquez's prior convictions. Jennifer's testimony describing the facts underlying those convictions added little to this damaging evidence.

Moreover, the prosecution presented a strong case against Marquez. L.B.'s credibility was supported by the testimony of her friends, who described noticeable behavioral and emotional changes in her after the incident and when she saw Marquez months later. L.B.'s credibility was also supported by forensic evidence—Marquez's semen on her bedsheets. Marquez's phone records further supported L.B.'s testimony,

21

showing he tried calling her about nine times within 24 hours after the incident. His repeated attempts to contact her undermined his story there was only consensual sexual activity between them initiated by L.B. Based on an examination of the entire record, it is not reasonably likely the jury would have resolved the credibility issues differently and reached a verdict more favorable to Marquez if they had not heard Jennifer's testimony regarding Marquez's conduct towards her.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


SANCHEZ, J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.